In re the Matter of the Complaint of James Herman METCALF and Margaret Metcalf as Owners of the S/T Lady Margaret, Her Engines, Tackle and Appurtenances in a Cause of Exoneration From or Limitation of Liability.

Desco Marine, A Division of Whittaker Corporation, Third Party Defendants.

Civ. A. No. G–78–241.

United States District Court,
S. D. Texas,
Galveston Division.

Dec. 14, 1981.

Randy J. Ungar, Ungar, Jacobs, Manuel & Kain, New Orleans, La., for plaintiff George Bosarge.

Tom Kirtley, Mandell & Wright, Houston, Tex., for plaintiff Sally Davis McGee.

Edward A. Dodd, Jr., Brown, Sims & Ayre, Houston, Tex., for defendants and third-party plaintiffs James Herman Metcalf and Margaret Metcalf.

Jack L. Allbritton, Fulbright & Jaworski, Houston, Tex., for third-party defendant Desco Marine.

## MEMORANDUM OPINION

HUGH GIBSON, District Judge.

At approximately 4:00 a. m. on October 13, 1978, the S/T LADY MARGARET caught fire and burned while on the ways at the Seabrook Shipyard in Seabrook, Texas. At the time of the fire, the captain, George Bosarge, and a fellow crewmember, Gerald Douglas Davis, were on board. Bosarge, asleep in his cabin, awoke to find his room engulfed in flames. He managed to escape with his life, but in so doing suffered second and third degree burns over 35% of his body. Davis did not survive the casualty. His burnt body was found in the engine room forward and below the galley area, adjacent to a metal pail being used by the crew as a makeshift toilet. The cause of death was asphyxiation.

Thereafter, James Herman Metcalf and Margaret Metcalf, the vessel owners, commenced an action for limitation of or exoneration from liability pursuant to 46 U.S.C. § 181 *et seq.* (1976). Claims were filed on behalf of Sally Davis McGee, mother of the decedent Davis, as well as other family members surviving him, and on behalf of George Bosarge. Pursuant to Fed.R.Civ.P. Rule 14(c), the Metcalfs then impled Desco Marine, the manufacturer of the vessel, seeking indemnity and contribution, asserting a claim for property damages arising from the fire, and demanding judgment against Desco Marine in favor of claimants, requiring Desco to answer and defend such claims as if sued directly.

Subsequently, it was announced to the Court on February 9 and June 12, 1981, that ostensible settlements had been reached between the vessel owners and the McGee and Bosarge claimants, respectively.[1] Contending that these settlements had rendered the limitation action moot, claimants sought leave of the Court to file a Rule 9(h) action against Desco Marine outside of the limitation action, and demanded a trial by jury. Desco conceded that the causes of action asserted by claimants were cognizable within the limitation proceedings by virtue of the Metcalf's invocation of Rule 14(c), but objected to the demand for jury trial. The Court denied claimants leave to file suit outside of the present action.[2]

---

1. The Court is advised of the premises of these settlement agreements. Bosarge settled with the Metcalfs for $80,000. The McGee claimants accepted $60,000 in settlement of their claims. Both settlements include reimbursement agreements and agreements to align as parties in any action against Desco Marine. *See* Defendant's Exhibit Nos. 1 & 2.

2. Of course, the invocation of Fed.R.Civ.P. 9(h) by plaintiffs does not create a right to trial by jury. Quite the opposite is true. *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 985–88 (5th Cir. 1978). A jury might be obtained if plaintiffs coupled their maritime claims with an action at law, *e.g.*, a claim under the Jones Act, 46 U.S.C. § 688, or if this Court's diversity jurisdiction could be invoked

The action came on for trial before the Court on August 25, 1981. By virtue of their settlement agreements, the Metcalfs, the McGee claimants, and Bosarge aligned as plaintiffs against Desco Marine, the sole defendant. Plaintiffs sought recovery upon the negligence of Desco Marine in the design and manufacture of the S/T LADY MARGARET, alleging that such negligence was the sole proximate cause of their damages.[3] Desco defended that it was not negligent in any respect, but, in the event it should be so found, that such negligence was not a cause of plaintiffs' injuries. Further, Desco asserted that plaintiffs' injuries were the unfortunate product of the contributory negligence of one or more of the plaintiffs. The Court, having considered the testimony of witnesses, the exhibits and depositions offered into evidence at trial, and the arguments and posttrial briefs of counsel, now enters this memorandum opinion as its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. Rule 52.

## I.

### THE FACTS

#### A. Events Preceding the Fire

The S/T LADY MARGARET, a 68-foot shrimping trawler with fiberglass hull and wood deckhouse, was built by Desco Marine in 1976 and purchased by the Metcalfs in January of 1977. The Metcalfs own three other shrimp trawlers built by Desco, all acquired subsequent to the purchase of the LADY MARGARET. Bosarge became the

master of the vessel sometime in September 1978. At the time of the casualty, the crew consisted of Bosarge, the decedent Davis, and Bosarge's father-in-law, Ralph Harmon. Both Davis and Harmon were hired by Bosarge after he assumed command of the vessel.

In the early part of October 1978, the LADY MARGARET put into the Seabrook Shipyards for repairs. In the interim, the crew remained aboard the vessel, performing light maintenance work. On October 12, a day before the fire, the ship was hauled up on the ways. While on the ways, she was without electrical connections or running water; however, the crew determined to remain on board the vessel despite the inconvenience. A metal pail was placed in the engine room below the galley for use as a makeshift toilet, and access to the vessel provided by means of a 30-foot ladder.

On the morning of October 12 the three crewmembers found themselves, as seamen sometimes do, temporarily impecunious. They arranged with Metcalf for an advance on their salaries, and secured a ride to Port Bolivar with Mary Jane Dorr, the wife of Andrew Dorr, a shipyard employee with whom the crew had become familiar, to pick up their money. It had also been arranged for the crew to attend a shrimp boil at the Dorr's residence that evening, and in anticipation of the evening's festivities the crew obtained two bottles of whiskey on the return trip. They may have consumed several beers during the return trip as well.

pursuant to 28 U.S.C. § 1332. *Powell v. Offshore Navigation, Inc.,* 644 F.2d 1063, 1065–66 (5th Cir. 1981). The settlements entered into between the claimants and the Metcalfs foreclosed the former avenue, and the post-settlement alignment of the parties foreclosed the latter, as complete diversity of citizenship is absent. The Metcalfs are asserted to be Florida residents, and Desco Marine is asserted to maintain its principal place of business in Florida. Thus, jurisdiction exists solely pursuant to federal admiralty jurisdiction, 28 U.S.C. § 1333 (1976).

**3.** In their original third-party complaint against Desco Marine, the Metcalfs asserted a cause of action based upon strict products liability. That cause, however, is nowhere to be found in

the pretrial order, which under Fed.R.Civ.P. 16 "controls the subsequent course of the action, unless modified at trial to prevent manifest injustice." *Lirette v. Popich Bros. Water Transport Inc.,* 660 F.2d 142 at 144 (5th Cir. 1981). Because the Court is of the opinion that the maritime doctrine of comparative fault is applicable to a strict liability claim, however, Desco should be liable under this theory in the same proportion as its liability for negligence hereinafter found by the Court. *See Miller Industries v. Caterpillar Tractor Co.,* 473 F.Supp. 1147, 1155 (S.D.Ala.1979). *See also Powell v. Offshore Navigation, Inc., supra,* at 1065 n.5. Therefore, it is unnecessary for the Court to consider this alternative basis for Desco's liability.

Dinner at the Dorr's residence was in the early hours of the evening. It is apparent that alcoholic beverages were imbibed freely during the evening. Bosarge testified that he had at least four to six drinks, both at the Dorr residence and at a neighborhood bar. Davis also had a good deal to drink. His autopsy revealed that he was legally intoxicated at the time of death, with a .249% blood alcohol level, the equivalent of consuming 12 one-ounce drinks of whiskey within an hour's time.

Between midnight and 1:00 a. m. on October 13, Bosarge and Davis borrowed Dorr's car to return to the LADY MARGARET. Harmon, either exhausted by a long day's activities or overcome by his consumption of alcohol, or—in all probability—both, was left behind at the Dorr residence, asleep on a couch. Bosarge testified that he returned to the bar he had visited earlier in the evening to have another drink. Davis, however, had fallen asleep in the car, so Bosarge left him there. Bosarge discovered that the bar was closing and, unable to buy a drink, he returned to the car. The weather was misty, and Bosarge learned that the car's windshield wipers were inoperative. A patron of the bar, however, volunteered to give the two seamen a ride back to the shipyard.

The shipyard was locked up for the night, so Bosarge and Davis initially had to traverse an 8-foot chain link fence to get into the shipyard, and then the 30-foot ladder to reach the vessel. Both men successfully navigated the course and arrived at the vessel at approximately 2:00 a. m. Bosarge testified that, after a brief conversation in the galley, he retired to his quarters on the forward starboard side of the deckhouse and went to bed. He did not know whether Davis did likewise or not.

At about 4:00 a. m. Bosarge awoke to find the deckhouse engulfed in flames. He soon realized that his only chance to escape the vessel with his life was to go directly through the raging fire. Wearing only jeans, he made good his desperate escape, but suffered extensive second and third degree burns to his upper body in the process.

Several persons on the premises, hearing Bosarge's screams of agony and cries for help, came to his aid. He was taken to John Sealy Hospital in Galveston, Texas, where he remained for approximately one month, undergoing extensive burn treatment.

The fire totally gutted the deckhouse. The ceiling and bulkhead between the galley and the sleeping quarters were completely burned away, as was the exterior wall with exception of several studs. Charles Reel, the Fire Marshal for the Seabrook Volunteer Fire Department, and Eudell Jiles, an officer with the Kemah Police Department, were witnesses to the fire, having responded to a report of the event. Their deposition testimony was that the deckhouse was completely in flames by the time they arrived. A short time thereafter, both witnessed an explosion, apparently of the butane tanks that provided fuel for the galley stove, sending flames shooting high above the fire.

Jiles, one of the first witnesses to arrive at the fire, also testified that he heard the agonized scream of a male voice, for approximately two seconds, eminating from the bow of the vessel below deck. After the fire was extinguished, Davis' body was discovered in the engine room, forward and below the galley. Although Davis' body was badly burned, the autopsy established that the cause of death was asphyxiation due to smoke inhalation. Based on the autopsy findings, Dr. Joseph Jachimczyk testified by deposition that Davis could have been conscious for several minutes before succumbing to the smoke and carbon monoxide.

B. The Origin of the Fire and Injury Producing Factors

There was no direct evidence as to the source of the fire or the events that precipitated it. Plaintiffs, relying upon a complex of circumstances and expert opinion, attempted to show that the fire originated in a pan of grease left unattended on a lit burner on the galley stove. The ensuing grease fire, plaintiffs alleged, ignited the

varnished plywood wall and ceiling above and behind the stove, leading ultimately to the destruction of the entire deckhouse. Plaintiffs contend that Desco was negligent in failing to utilize fire retardant or non-combustible materials behind and over the gas stove, and that but for the negligent design and manufacture of the LADY MARGARET, the grease fire would have been safely contained in the immediate area of the stove, without the ensuing loss of life, limb and property.

The stove in question was a four-burner butane stove standing approximately 36 inches high. The clearance between the deckhouse ceiling and the top of the stove was 48 inches. The walls adjacent to the stove below burner level were protected by fire retardant material, however the walls and ceiling above burner level consisted only of ½-inch varnished plywood. Following the fire, the charred stove was discovered on its side with a partially melted cast-iron skillet near or underneath it. The fingers on the back two burner rings of the stove, like the skillet, were partially melted, indicating that they had been exposed for a prolonged period to more intense heat than the front two. The burn pattern of the fire also suggested that the flame had been more intense in the area of the interior bulkhead where the stove was located than at the outer walls of the deckhouse.

Plaintiffs rely principally on the testimony of three expert witnesses. The deposition testimony of the first of these experts, Herbert Shilstone of the Shilstone Testing Laboratory, a civil engineer with nearly a half-century's experience in the investigation of fires and explosion, was offered at trial. In his deposition, Shilstone indicated that in his opinion the fire was caused by the ignition of combustible parts of the bulkhead behind the stove. He indicated that a grease fire on the stove was a possible source of ignition, but could not exclude the possibility of alternative sources. Further, he testified that the grease fire itself,

even when supported by a butane burner flame, could not have caused the melting of the back burner rings and the iron skillet. While a grease fire and burner flame might have contributed, Shilstone testified that the melting temperatures could have been reached only if additional combustible materials were present on the stove top. This was confirmed by Desco's expert, Dr. Rex McLelland.

Plaintiffs also offered the deposition testimony of Charles Reel, who in addition to examining photographs of the LADY MARGARET, had conducted an investigation on board the vessel shortly after the fire. Reel's official report of the investigation offered no indication as to the cause of the fire. Based upon the burn pattern of the fire and the partially melted back burners and skillet, however, Reel opined in his deposition that the fire had originated in the stove area. Like Shilstone, Reel indicated only that a grease fire was a possible source of the blaze.

Sterling Jones, a Houston Fire Department arson investigator with some 13 years of practical experience, however, testified unequivocally at trial that the source of the fire aboard the LADY MARGARET was a grease fire in a skillet left unattended on an open flame. His opinion was predicated on similarities between the fire on the LADY MARGARET and the many grease fires he had encountered in the course of his duties. Jones pointed specifically to the burn pattern of the fire and the melted condition of the back burners and the skillet. He also felt it significant that the body of Davis was found away from the kitchen area.[4]

Desco Marine countered with its own expert, Dr. Rex McLelland, a professor at Rice University and an expert in the field of thermodynamics. McLelland testified that neither the temperature of a grease fire nor a regulated butane flame could have caused the partial melting of the cast-iron skillet and the back burner fingers; however, he could not exclude a grease fire as an initial

---

4. Jones testified that the victims of grease fires are commonly found some distance from the kitchen area, since such fires are often precipitated by the failure of the person utilizing the stove to turn off the flame before leaving the area.

source of combustion. On cross-examination, McLelland conceded that, given time, the flames from a grease fire on the stove top could have resulted in the combustion of the varnished plywood walls and ceiling. McLelland concurred with Shilstone's opinion that the melting was probably caused by combustible parts of the vessel falling on the stove. He also noted that, once the fire had melted the gas regulator in the butane lines leading to the stove, an unregulated butane flame could have caused the partial melting.[5]

Desco contends that from the evidence of record a rational fact finder could only speculate as to the cause of the fire on board the LADY MARGARET. The Court does not agree. There is sufficient evidence, albeit circumstantial, from which a finder of fact reconstructing the events on the early morning of October 13, 1978 could reasonably conclude that the fire more likely than not originated as a grease fire in a skillet left unattended on an open burner flame.[6] Desco also argues that the fire might have been started by an errant cigarette, since both Bosarge and Davis smoked, or by a butane leak. The record, however, is wholly void of any support for the former theory, and the greater weight of credible evidence preponderates against the latter. Bosarge testified that he had discovered a butane leak around a coupling on one of the butane tanks several days prior to the fire, but had corrected it. As a precautionary measure, Bosarge testified that thereafter

he turned the gas on and off at its source when using the stove.

Relying upon the deposition testimony of Andrew Dorr, Desco contends that a butane leak persisted at the time of the fire. Desco urges that this is consistent with the precautionary measure testified to by Bosarge. Assuming the butane leak had not been remedied before the morning of October 13, however, the evidence on record does not support the contention that it was a cause of the fire. Eye witness accounts indicate that an explosion sending flames high into the air rocked the LADY MARGARET well after the fire had engulfed the deckhouse. The butane tanks are the only apparent source of this explosion. Moreover, plaintiffs' experts testified that the most intense fire damage was to the interior bulkhead near the stove, and not to the exterior bulkhead near the butane tanks.

■ The Court finds from a preponderance of the credible evidence in the record that the fire which gutted the deckhouse of the LADY MARGARET on October 13 originated as a grease fire in a cast-iron skillet left unattended over an open burner flame on the stove. The Court further finds from a preponderance of the evidence that the fire resulted from the inadvertence of the decedent Gerald Davis. The fire on board the LADY MARGARET was of a type which ordinarily does not occur in the absence of the human factor, and it is undisputed that Davis was at the time of the fire the only person on board the vessel who

---

**5.** This theory is consistent with the contention that one of the stove's back burners was left on, since the gas would flow through the path of least resistance, i.e., an open burner.

**6.** In addition to expert testimony, other evidence shows that the crew of the LADY MARGARET had been living and eating on board the vessel while she was in the shipyard. Once on the ways, she was without running water to clean cooking utensils. Bosarge testified that on the morning of October 12 he cooked breakfast for the crew, and on their return from Port Bolivar that afternoon, although disputed in the deposition of Mrs. Dorr, cooked steaks in the skillet.

The sufficiency issue turns in large part on the weight assigned to the expert opinions received, and an assessment of the credibility of

fact witnesses where their testimony is in conflict. Through cross-examination Desco established that Jones, the principal expert relied upon by plaintiffs, unlike McLelland and Shilstone, had little or no scientific understanding of fires and their origins. However, Jones' opinion was based not upon scientific acumen, but upon his many years of practical experience as an arson investigator. Aside from Jones' unfamiliarity with the burning temperatures of grease and other properties, his qualifications stand virtually unimpeached, and his testimony should be weighed accordingly. Additionally, McLelland's testimony does not conflict with the testimony of plaintiffs' experts; in fact, it is corroborative of that testimony in several salient respects.

could have set in motion the events culminating in the casualty. The most reasonable inference from the evidence is that Davis did not go to bed after returning to the vessel on the morning of October 13, but decided to fix something to eat; that he lit a rear burner on the stove, intending to or possibly cooking a meal in the skillet and consuming it;[7] that he left the galley area without turning off the burner, perhaps to use the makeshift toilet in the engine room; that, in any event, Davis left the stove unattended for a considerable period of time—long enough to allow a grease fire to start and then ignite the flammable varnish and plywood wall and ceiling behind and over the stove, leading ultimately to the destruction of the entire deckhouse.

## II.

## THE LIABILITY ISSUES

### A. Gerald Douglas Davis

■ The Court finds from a preponderance of the evidence that Davis was negligent on the morning of October 13, and that such negligence was a legal cause of the fire which consumed the deckhouse of the vessel, seriously injured plaintiff Bosarge, and took Davis' life. Negligence is defined generally as conduct falling below the standard established by law for the protection of others, or one's self, against unreasonable risk of harm. Restatement (Second) of Torts § 282 (1965). The standard is one of ordinary care, that which a reasonably prudent person would exercise under the same or similar circumstances. There is no direct evidence of Davis' conduct after returning to the vessel on October 13, however, the reasonable inferences to be drawn from the circumstantial evidence preponderate toward a finding of negligence. The evidence is sufficient to establish that the fire began as a grease

fire in a skillet on the stove. Davis was the only person on board the vessel who at the time of the fire could have turned on one of the stove burners under the skillet and set in motion the chain of events which resulted in the casualty. It is clear that Davis left the stove unattended not momentarily, but for an extended period of time.

Plaintiffs contend that Davis, being deceased, is entitled to a legal presumption that he exercised ordinary care for his own safety. Plaintiffs also contend that Davis was entitled to rely upon Desco Marine to design and manufacture the stove area so as to minimize the risk of injury from foreseeable use or misuse. Davis was not thereby relieved of the duty to exercise ordinary care for his safety and the safety of other persons and property, and any presumption that he so acted is overborne by substantial evidence to the contrary. Davis' conduct on the night in question clearly exceeded the bounds of both reasonable care for his safety and the safety of others as well as reasonable reliance on the vessel manufacturer. The decedent, in the exercise of ordinary care, should have turned off the stove before leaving the galley. The risk was a foreseeable one. Davis' heedlessness, whether or not resulting from or exacerbated by intoxication, was negligence and a legal cause of the damages sustained by plaintiffs.

### B. Desco Marine

■ The Court also finds from a preponderance of the evidence that Desco Marine was negligent in the design and manufacture of the S/T LADY MARGARET and that such negligence was a legal cause of plaintiffs' damages. See Miller Industries, Inc. v. Caterpillar Tractor Co., 473 F.Supp. 1147, 1153 (S.D.Ala.1979). Specifically, Desco was negligent in failing to construct the wall behind the stove above burner

---

7. The autopsy report indicated that undigested egg and potato was found in Davis' stomach. Whether the food was consumed by Davis earlier in the evening at the Dorr residence or upon his return to the vessel is a disputed fact issue. If the food was eaten at the Dorr's house, a considerable period of time would have elapsed prior to Davis' death. The length of time necessary for the digestion of various foods, however, is not a matter of common or ordinary knowledge, and there is no expert testimony in the record which sheds light on this question.

level and the ceiling above the stove top with fire retardant or non-combustible materials. These areas would be directly exposed to flames and heat in the event of a fire, such as a grease fire, on the top of the stove.

It is clear from the evidence of record that Desco was concerned with the risk of radiated heat from the stove generated during normal use. To this end, fire retardant materials were utilized in the construction of adjacent walls and surfaces below the burner level of the stove. According to Dave Strickland, the shipbuilder's engineering manager, Desco felt that similar precautions were not required with respect to the wall and ceiling over the stove,[8] although the cost of such safety features would not have exceeded several hundred dollars.

While Desco was appropriately concerned with the dangers attendant to radiated heat from the appliance, it failed to exercise reasonable care in connection with the dangers likely to flow from a fire originating on top of the stove. Desco could reasonably foresee that its failure to use fire retardant material in areas exposed to such a fire would create an unreasonable risk of harm to plaintiffs. Neither the intervening negligence of Gerald Davis on the morning of October 13, nor recognition that the magnitude of the fire on board the LADY MARGARET was such as to be unlikely in the absence of negligence is sufficient to insulate Desco Marine from liability on grounds of unforeseeability. *Williams v. Brasea, Inc.*, 497 F.2d 67, 74 (5th Cir. 1974), amended, 513 F.2d 301 (5th Cir.), *cert. denied*, 423 U.S. 906, 96 S.Ct. 207, 46 L.Ed.2d 136 (1975); *Ammar v. American Export Lines, Inc.*, 326 F.2d 955, 959 (2d Cir.), *cert. denied*, 379 U.S. 824, 85 S.Ct. 48, 13 L.Ed.2d 34 (1964).

There are countless situations in which one charged by law with the duty to exercise ordinary care is required to anticipate and guard against the conduct of others, including "that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated." W. Prosser, *supra*, § 33, at 171. Given the foreseeability of injury and the relatively simple and inexpensive means at Desco's disposal to safeguard against the danger, the shipbuilder's conduct in the design and manufacture of the S/T LADY MARGA-

---

**8.** Plaintiffs allege that the installation of the stove on board the LADY MARGARET was not in compliance with National Fire Protection Association (N.F.P.A.) safety standards of general application in the shipbuilding industry. Specifically, plaintiffs cite N.F.P.A. no. 302, item 411(d), which provides:

(d) All woodwork and other combustible materials above stove tops and all woodwork or combustibles immediately surrounding stoves shall be effectively insulated with non-combustible materials or sheathing.

The N.F.P.A. recommendation, of course, is some evidence of the standard of care recognized generally in the shipbuilding industry. Plaintiffs offered at trial the testimony of A. J. Scardino, a safety and human factoring engineer, who opined that the N.F.P.A. standard required Desco to use fire retardant materials for the wall and ceiling over the stove. Strickland disagreed with this assessment. It was observed that the 48-inch clearance between the stove top and the ceiling comported with the minimum clearance recommended by the N.F.P.A. for installation of combustible materials over heat producing appliances. Strickland did not consider the term "woodwork or other combustible material" to include ceilings in-

stalled at the recommended minimum clearance, and apparently did not construe the wall behind the stove above burner level to be combustible material "above stove tops" or "immediately surrounding stoves." Strickland also testified that Desco had constructed over 2000 vessels with installation designs similar to that of the LADY MARGARET without reports of like casualties.

While Desco had heretofore experienced little difficulty with installation designs similar to that of the LADY MARGARET, Strickland's rather restrictive interpretation of the N.F.P.A. guidelines seems suspect. Even if Desco's reading of the safety standard comported with the general understanding of the industry, Desco could not avoid liability if by applying the standard as construed it failed to exercise reasonable care under the circumstances. What constitutes reasonable care under the circumstances depends on the foreseeability and gravity of injury, and the presence of reasonable means to avoid it. *See, e.g., Conway v. O'Brien*, 111 F.2d 611, 612 (2d Cir. 1940). *See generally* W. Prosser, Handbook of the Law of Torts § 32 (4th ed. 1971). While Desco's past experience is clearly relevant to the foreseeability issue, it is by no means a dispositive factor.

RET falls below that standard required by law for the protection of others against unreasonable risk of harm.

### C. George Bosarge

■ Desco Marine contends that Bosarge, as master of the vessel, was negligent in either of two respects: First, in permitting Davis to return to the vessel in an obvious state of intoxication; and second, in leaving Davis alone and unsupervised after the two returned to the vessel on the morning of October 13. There is substantial evidence that Davis was intoxicated, although the extent to which this intoxication impeded Davis' judgmental ability, reaction time, reflexes and other functions is unclear. Clearly, however, Davis was legally drunk under applicable state law. *See Reyes v. Vantage S.S. Co., Inc.*, (Reyes II), 609 F.2d 140, 142 & n.1 (5th Cir. 1980). Despite this, Davis apparently was physically able to surmount an eight-foot chain fence and a 20 to 30-foot ladder unassisted on his return to the vessel, and Bosarge testified that Davis did not appear drunk to him. *See id.* at 142 n.1. Bosarge, of course, knew that Davis had been drinking, but the Court cannot conclude from the evidence before it that Bosarge was negligent simply in letting Davis return to the vessel and in failing to supervise Davis after their return.

### D. George Herman and Margaret Metcalf

Desco Marine asserts that the vessel owners were negligent in failing to maintain or enforce a policy against crewmembers drinking intoxicating beverages aboard ship or being aboard the vessel while intoxicated. Desco also contends that the Metcalfs were negligent in failing to instruct or train the crew in fire safety, prevention, and fighting.

■ With respect to the first of these contentions, the Court might agree had the Metcalfs permitted Davis to be aboard the vessel at sea in a high state of intoxication. "Certainly the sea holds enough perils for a sailor, even a sober one." *Reyes v. Vantage S.S. Co., Inc.* (Reyes I), 558 F.2d 238, 245

(5th Cir. 1977) (Brown, C. J.). The Court might agree with Desco had the Metcalfs permitted or encouraged the use of intoxicants by crewmembers on board without any supervisory control of its use. *Id.* at 244. Neither situation is present here, however, and the Court does not find that the Metcalfs were negligent in this respect.

■ With respect to Desco's second contention, maritime law may well impose upon the shipowner the duty to instruct crewmembers in fire safety, prevention, and fighting. *See Pan-Alaska Fisheries, Inc. v. Marine Construction and Design Co.*, 565 F.2d 1129 (9th Cir. 1977). Assuming *arguendo* that the Metcalfs were negligent in this respect, the Court, in light of its previous findings, holds that such was not a legal cause of the casualty.

■ The Court does find, however, that Davis' negligence must be imputed to the Metcalfs under familiar *respondeat superior* principles. *See Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 362–64 (5th Cir. 1980); *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 222 (5th Cir. 1975). The Metcalfs contend that these principles are inapplicable, urging that Bosarge was Davis' employer. Under an arrangement between the parties, Bosarge as captain of the vessel, could select and hire a crew. The crew was to be paid shares from the proceeds of the percentage of the catch paid to Bosarge. This, the Metcalfs contend, is sufficient to establish the lack of an employer-employee relationship between Davis and themselves. *See Solet v. M/V Capt. H.V. DUFRENE*, 303 F.Supp. 980 (E.D.La.1969).

The Court disagrees. The determining factor in cases involving fishing vessels operated on a "share" system is the degree of control retained by the owner over operation of the vessel and conduct of the fishing operation. *Id.* at 982 n.1. The fact that Bosarge, as master of the vessel, could select the crew is not unusual; moreover, there is no evidence that Bosarge had sole responsibility for selecting and hiring a crew. George Metcalf testified, in fact, that Davis had previously been employed on

another Metcalf vessel. Bosarge did not select the buyers for the catch; Metcalf required the delivery of the catch for use in his food processing business. The vessel owners apparently decided when the LADY MARGARET would be in operation and when she would be laid up for repairs. Clearly, the Metcalfs made advances to both captain and crew while the vessel was in the Seabrook Shipyards, and no suggestion is made that these were merely loans. The Court finds that the Metcalfs were Davis' employers at all times material to this action. *See id.* at 982 n.1 and cases cited therein. *See also Wheatley v. Gladden*, 660 F.2d 1024, 1046–27 (4th Cir. 1981).

## III.

### THE APPORTIONMENT OF LIABILITY

■ In an admiralty case where the negligence of one or more of the parties are concurring causes of damage, the Court may apportion the liability to the negligent parties in accordance with the comparative degree of their fault. *Miller Industries, Inc. v. Caterpillar Tractor Co., supra,* at 1155. *See United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir. 1979). In this case, of course, Bosarge and the McGee claimants settled with the Metcalfs prior to trial. Those settlements relieve the vessel owners of any further liability to the claimants. *Leger v. Drilling Well Control, Inc., supra,* at 1248. The Metcalfs remain parties to the suit, however, and *Leger* accordingly requires application of the maritime doctrine of comparative fault. In other words, Desco Marine is liable to plaintiffs only for that portion of the total damages proportionate to its percentage of fault. *Id.*[9]

**9.** The doctrine of comparative fault is brought into play in this case in two distinct ways, although its application is reducible to a single result. Under the rule of *Reliable Transfer* as applied in *Leger*, the doctrine operates to apportion liability where the negligence of one or more parties are concurring causes of damage to another. Where contributory negligence is at issue, the doctrine operates in mitigation of damages. Accordingly, under *Leger*, George

■ Assessing the comparative fault to Desco Marine, Gerald Davis, and the Metcalfs in connection with the damages occasioned by their concurring negligence, the Court finds the percentage of fault attributable to Desco's negligence to be 40%, and the percentage of fault attributed to the negligence of Davis, the same being imputed to the Metcalfs, to be 60%. Therefore, the Court will direct the entry of judgment against Desco Marine in the amount of 40% of plaintiffs' proven damages, as found by the Court in Section IV of this opinion.

## IV.

### DAMAGES

#### A. George Bosarge

■ The Court finds that plaintiff Bosarge is entitled to recovery for the following elements of damages: physical pain and suffering, mental anguish, disability, loss of capacity for the enjoyment of life, medical expenses, past lost earnings and loss of future earning capacity. *See e.g., Allen v. Seacoast Products, Inc., supra,* at 365–66.

Bosarge incurred substantial second and third degree burns in the fire, the majority of the burns being second degree. Although third degree burns are more severe, Dr. Ronald Sato testified that second degree burns are the most painful because nerve endings remain intact. Bosarge was admitted to and remained in the John Sealy Burn Center for approximately one month, undergoing daily debridement treatments, and, later, extensive skin grafting to the upper right portion of his body. With the exception of eight occasions, Bosarge underwent the debridement procedures fully conscious and without the aid of pain-impeding

Bosarge's judgment against Desco Marine is credited with the dollar amount represented by the proportion of negligence attributable to his Jones Act employers, the Metcalfs, with whom he settled prior to trial. Sally Davis McGee's judgment against Desco Marine is reduced in proportion to the contributory negligence of the decedent Gerald Davis, and the Metcalf's judgment against Desco Marine is reduced in proportion to the negligence imputed to them.

medications. The debridement process is excruciatingly painful for a patient with significant second and third degree burns, since it requires the patient's body to be emersed in a mild acid solution and the damaged areas scrubbed and scraped. These daily treatments and Bosarge's fearful anticipation of them understandably engendered much mental anguish, even though he fully realized that the treatment was essential to his recovery. The Court recognizes that it may be difficult for one who has not experienced the ordeal of burn treatment to comprehend fully its effects upon the human psyche, but it is clear that Bosarge was in excruciating agony in the month-long period during which he underwent intensive medical treatment, and that he experienced substantial pain and suffering and mental anguish.

Despite the more terrifying aspects of the treatment at John Sealy, Bosarge was fortunate to have received the best and most advanced burn care available. The medical treatment and surgery he received at John Sealy produced excellent results. While Bosarge is not now, nor will he ever be, totally free of discomfort, he is essentially free of physical pain, and the disfigurement associated with his burns is minimal. There is no evidence of hypertrophic scarring or keloid formation, and no observable limitation of motion in the burned areas of his body.

That is not to say, however, that Bosarge will not experience further difficulties as a result of his injuries. Surely, he has suffered permanent physical impairment and disability. He has a high intolerance to heat and cold, and must avoid prolonged exposure to the elements. The burns wrought metabolic changes, and Bosarge tires more easily than before. The burned areas of his body cannot perspire, and the skin cannot lubricate itself naturally. Indeed, the burnt skin can not improve in time; its condition may indeed become worse.

Bosarge's physical limitations will cause him to experience a number of problems in everyday life, including impairment of recreational activities. Clearly, his capacity for the enjoyment of life has been diminished. The Court finds that the sum of $155,-000 will fairly and reasonably compensate Bosarge for the pain and suffering, mental anguish, disability, and loss of life's enjoyment occasioned by his injuries. Desco Marine's liability for those items of damages, as well as other items recoverable by Bosarge, will extend only insofar as its negligence was a concurring cause of the damages.

Bosarge was unable to work for a period of approximately seven months. He reported income as a commercial fisherman in 1977 of $15,695.75. Prior to his injuries in 1978, he reported income of $6,937. Commercial fishing is a seasonal occupation, and income varies in proportion to the catch; but Herman Metcalf testified that an industrious fisherman could earn on the average $15,000 to $18,000 a year. The Court finds that Bosarge sustained lost earnings prior to trial in the amount of $8,750.

After recovering from his injuries, Bosarge attempted for seven months to return to the life of a commercial fisherman. The physically demanding nature of the work in view of Bosarge's casualty-related disabilities, however, precluded his successful return to this previous occupation. Subsequently he obtained employment as the captain of a crew vessel with Bud's Boat Rental, Inc. of Venice, Louisiana, and is presently so employed. For the calendar year 1980 Bosarge reported income in this employment of $24,190, more than he ever made in any single year as a commercial fisherman. It is apparent from the record that Bosarge worked steadily in 1980, taking as few as ten days off.

In light of this, Desco Marine contends that Bosarge has failed to establish that he will suffer any impairment of future earning capacity as a result of his injuries. Bosarge contends, conversely, that the debilitating effects of his burns will increase with time, and relying upon the medical opinions of Dr. James Clark, his treating physician, and Dr. Ronald Sato, estimates that his injuries will result in a 25% to 50%

preclusion of his productive work life. The Court is unable to accept this estimate as an accurate assessment of the reasonable range of Bosarge's likely future earnings impairment. It is evident from the trial testimony of Dr. Sato that his 50% figure was based in part on the assumption that Bosarge would continue in the physically arduous job of a commercial fisherman. Segments of Dr. Clark's deposition indicate that his assessment was informed by similar considerations. Certainly, if Bosarge's vocational and educational background limited him to commercial fishing, he would be entitled on the present record to a substantial award for loss of future earning capacity. Bosarge, however, is vocationally qualified to captain vessels such as the one he is currently master of, and such occupation is less physically demanding upon him and affords him greater protection from the elements.

Based on his 1980 earnings, it is conceivable that Bosarge could traverse the remainder of his normal work-life expectancy with his earning capacity undiminished, provided he is able to find continued employment of the type he is presently engaged in. From the evidence, however, the Court has determined that Bosarge in reasonable probability will sustain some impairment of earning capacity in the future. Clearly, the evidence shows that he has incurred definite and permanent limitations to his physical endurance as a result of his injuries. Bosarge's present job is not free from physical demands, nor can he avoid exposure to the elements. While his position is essentially supervisory, Bosarge testified that he is required from time to time to assist the crew in physically exerting tasks, and that he cannot spend all of his time in the sheltered environment of an air-conditioned wheelhouse. It is unlikely that any similar position Bosarge might be qualified to hold in the future would be less taxing. So long as Bosarge remains similarly employed in the maritime industry, he cannot escape physically exerting work; nor can he avoid in its entirety the raw and sometimes savage weather encountered at sea.

At the time of trial George Bosarge was 30 years old, with a life expectancy of 41 years and a work-life expectancy of 32.7 years. Any award for loss of earnings in the future, of course, must be limited to reasonable work-life expectancy, and, along with future medical expenses, must be discounted to present value by employing an appropriate interest rate prevailing in Galveston County at the time of trial. *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975). Any future inflationary or deflationary effect on earnings is not to be considered. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 332 (5th Cir. 1977). Considering Bosarge's earnings in 1980, his reasonable work-life expectancy, and discounting to present value at an interest rate of 8% per annum, the Court finds that the sum of $16,800 will fairly and reasonably compensate Bosarge for the impairment of his future earning capacity.

In order to maintain his damaged skin in as good a condition as possible, Bosarge will be required to utilize various skin products for the remainder of his life. Ms. Pat Henderson, an expert in the care of burn tissue and a supplier of various skin products currently used by Bosarge, testified that the annual cost of such products if used to the maximum recommended extent would approximate $700. In view of Captain Bosarge's testimony, however, the Court is of the opinion that he is not currently utilizing the products to this degree. Nor is there any evidence which suggests that Bosarge will utilize skin products to this degree in the future, although his usage may well increase over time. The Court finds that Bosarge's future medical expenses of this nature are likely to amount to $400 per annum. The present value of these expenses for Bosarge's anticipated life expectancy discounted at 8% is $4,800.

In sum, Bosarge's total damages as found by the Court amount to $185,350. In accordance with the Court's apportionment of disability, Bosarge shall have judgment against Desco Marine in the aggregate of $74,140, together with interest and costs as hereinafter provided.

**B. Sally Davis McGee**

██ The plaintiff McGee, individually as the surviving mother of Gerald Davis and as administratrix of the decedent's estate, seeks recovery from Desco Marine under a general maritime wrongful death action. *Sea-Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974); *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). The Court finds that McGee is entitled to recovery on the following items: the decedent's conscious pain and suffering prior to death; reasonable funeral expenses incurred; actual pecuniary loss; and loss of society. Desco's liability shall be reduced proportionately to the percentage of fault attributable to the decedent's contributory negligence.

██ Damages for conscious pain and suffering experienced by a decedent prior to death are recoverable under the general maritime law. *Thompson v. Offshore Co.*, 440 F.Supp. 752, 761 (S.D.Tex.1977). The Court finds that the decedent Davis experienced pain and suffering prior to death. The cause of death was asphyxiation, and the carbon monoxide saturation in Davis' blood was sufficient to permit Dr. Jachimczyk to opine that Davis was conscious prior to being overcome by the smoke. Additionally, Eudell Jiles testified to hearing the solitary scream of a male voice eminating from the vicinity of the vessel in which Davis' body was found.[10] The evidence is sufficient for the Court to infer that Davis, who experienced burns over 40% to 50% of his body, was conscious for a brief period before succumbing to smoke and carbon monoxide, and the Court awards plaintiff the sum of $10,000 for pain and suffering, subject to mitigation by the amount of the decedent's contributing negligence.

██ A survivor may recover under general maritime law for the actual financial contributions the decedent would have made during his normal anticipated life span. *Sea-Land Services v. Gaudet, supra,*

414 U.S., at 584–85, 94 S.Ct., at 814–15. The proper measure of damages for such loss of support is the survivor's reasonable pecuniary expectancy over the remainder of the life expectancy of the decedent or the survivor, whichever is shorter, discounted to present value. *Thompson v. Offshore Co., supra,* at 762. At the time of his death, Gerald Davis was 34 years old with a life expectancy of 37.4 years. The plaintiff was 60 years old with a life expectancy of 22.3 years at the time of Davis' death. Her life expectancy at the time of trial was 19.9 years.

Gerald Davis was one of six children born to Mrs. McGee. The surviving children are between the ages of 30 and 44, and all are or have been married and live near the plaintiff in North Carolina. Mrs. McGee testified that her children make no contributions to her support, and that her sole source of income is Social Security Retirement Benefits of approximately $343 per month. She lives in a mobile home in Burlington, North Carolina. The mobile home has been paid for.

Gerald Davis never married, and Mrs. McGee testified that the decedent remained a resident of her household after her other children had left. During the time he lived with her, Mrs. McGee testified that Davis paid room and board of approximately $80 per month in addition to making other sundry household purchases. She testified that Davis purchased for her several major appliances and items of furniture whose costs was approximately $900, and that between 1973 and 1976 he contributed $900 toward note payments on the mobile home. Apparently, Davis' contributions were not made on a regular basis, and may have consisted largely of gifts made on holidays and other special occasions. In 1976, Mrs. McGee recalled that her son made a gift to her of a $500 income tax refund.

While the decedent lived with his mother for an appreciable portion of his life, he was

---

10. Desco suggests that the scream might have been that of Bosarge. However, Bosarge testified that after escaping the vessel he screamed repeatedly until others came to his assistance.

By every indication, Bosarge had escaped the vessel and was en route to a hospital before Jiles and others arrived at the scene in response to a report of fire.

not a permanent resident in her household during the last several years of his life. His earnings reflect that he was an itinerant worker and that he was employed outside the state of North Carolina much of the later 1970's. Certainly, that was the case after he was employed by the Metcalfs as a commercial fisherman. Nor, in view of Davis' age and his recent occupations, is it likely that he would have continued to live with his mother on a permanent basis had he survived. He had indicated to Bosarge and others that he enjoyed the occupation of a commercial fisherman and intended to remain in the fishing industry.

In considering the plaintiff's reasonable pecuniary expectancy the Court must focus on the decedent's history of earnings and contributions and anticipated future earning potential. *Thompson v. Offshore Co., supra,* at 763. In the three years preceding his death, Davis did not report income in excess of $6,000. Had he continued to be employed as a commercial fisherman, his earnings in time might have approached $15,000 to $18,000 a year. The Court has no doubt that Davis would have continued to make contributions to his mother similar to those he had made in the past; however, with the exception of the room and board paid by Davis during periods in which he lived with his mother, his contributions to her were sporadic and irregular, and consisted primarily of gifts, occasional purchases of various household items, and donations of occasional "windfalls" such as tax returns. Assuming that Davis would have enjoyed significant and steady income in the future, an assumption that finds limited support in the record, the evidence does not persuade the Court that Davis' financial contributions to Mrs. McGee would have increased significantly. The Court is constrained to note that Mrs. McGee was not dependent upon her son for support at the time of his death, and the Court must weigh this factor accordingly in assessing plaintiff's future losses. The Court is unable to conclude that the financial contributions the decedent was likely to make to Mrs. McGee over the remainder of her life span would have exceeded an average of $500 per year. Therefore, after discounting future contributions at 8%, plaintiff McGee is entitled to $6,367 for loss of future contributions.

■ Loss of a decedent's services is recoverable under a general maritime wrongful death action. *Sea-Land Services v. Gaudet, supra,* 414 U.S., at 584–85, 94 S.Ct., at 814–15. A survivor may recover the monetary value of household services the decedent provided and would have provided but for his wrongful death. In this instance, Mrs. McGee testified that the decedent performed various household services during the periods that he lived with her, including general repair, yard upkeep, and maintenance of her automobile. In determining whether damages are recoverable for lost services, however, the Court must consider, *inter alia,* the decedent's anticipated presence at home in light of his age and the likely nature of his occupation. *Thompson v. Offshore Co., supra,* at 764. In view of the Court's findings as to these factors, no recovery for loss of services is warranted. Similarly, given plaintiff's normal life expectancy as compared to the decedent's anticipated life expectancy, there is no basis for a recovery of loss of prospective inheritance. *See id.* at 762–63.

Plaintiff also seeks damages for the loss of her son's society. The term "society" embraces a broad range of mutual benefits each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, and protection. *Sea-Land Services v. Gaudet, supra,* 414 U.S., at 585, 94 S.Ct., at 815. Although loss of society extends to a broad spectrum of nonpecuniary items, mental anguish and bereavement over the loss of a loved one are not compensable under general maritime law. *Id.* at 585 n.17, 94 S.Ct. at 815 n.17. With respect to immediate family members, lack of financial dependency is not a bar to recovery of nonpecuniary loss of society. *Thompson v. Offshore, supra,* at 765.

Criteria which may be considered in determining a right to and amount of recovery for loss of society include:

1. Relationship of husband and wife, or of parent and child . . .;
2. Continuous living together of parties at and prior to time of wrongful death;
3. Lack of absence of deceased or beneficiary for extended periods of time;
4. Harmonious marital or family relationships;
5. Common interest in hobbies, scholarship, art, religion, or social activities;
6. Participation of deceased in family activities;
7. Disposition and habit of deceased to tender aid, solace and comfort when required; and
8. Ability and habit of deceased to render advise and assistance in financial matters, business activities and the like.

*Id.* at 764.[11] Considering the evidence of record bearing on these factors, the Court awards the plaintiff $10,000 for the loss of her son's society.

Funeral expenses for the decedent come to $2,711.62. Thus, plaintiff's total damages as found by the Court amount to $29,-078.62. Desco Marine is liable for 40% of these losses, or $11,631.45.

**C. James Herman and Margaret Metcalf**

The Metcalfs as owners of the S/T LADY MARGARET seek to recover for property damages to the vessel. The parties have stipulated the amount of these damages, in the form of repairs, to be $90,-505.13. Therefore, in accordance with the Court's finding on the issues of liability and comparative fault, Desco's liability for these damages is $36,202.06.

**D. Prejudgment Interest**

While the award of prejudgment interest in admiralty cases is committed to the Court's discretion, an award of prejudgment interest is clearly the rule rather than the exception. *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1217 (5th Cir.

11. *See generally*, S. Speiser, Recovery for

1980); *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, (5th Cir. 1978). Such interest is to be awarded except in cases where "peculiar circumstances" justify a refusal. *Mecom v. Levingston Shipbuilding Co., supra*, at 1217; *Dow Chemical v. M/V GULF SEAS*, 593 F.2d 613, 614 (5th Cir. 1979). Such circumstances are not present here. Accordingly, the Court is of the opinion that plaintiffs are entitled to recover from Desco Marine interest at the rate of 9% per annum from October 13, 1978 until said judgment is paid.

## V.

## CONCLUSION

Judgment shall enter against Desco Marine and in favor of plaintiffs in accordance with this Memorandum and Order. The judgment will bear interest at the rate of 9% per annum from October 13, 1978, until finally paid. Costs of court are taxed against the defendant.

It is so ORDERED.

Wrongful Death 223 (1966).